UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSEPH RICHARD DAYTON,

     Plaintiff,

v.                                 Case No. 8:22-cv-2366-CPT

UNITED STATES OF AMERICA,

     Defendant.
_____/

**O R D E R**

     Plaintiff Joseph Richard Dayton initiated this action against Defendant United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, averring that he developed incurable metastatic prostate cancer due to the negligent medical care he received from the Veterans Administration (VA). (Doc. 1). For relief, Dayton sought monetary damages for pain, suffering, and a shortened life expectancy, among other harms. *Id.*

     Following the close of discovery, the matter proceeded to a bench trial, which lasted four days. Counsel for both sides were well-prepared throughout the trial and represented their respective clients with the highest degree of professionalism. During the trial, Dayton testified, as did five of his treating physicians: Dr. Bruce Hunt, Dr. Ismet Saifullah, Dr. Enos Perez, Dr. Marco Camuzzi, and Dr. Anuja Pradhan.

Dayton also called two expert witnesses to testify on his behalf, Dr. David Libert, a primary care physician, and Dr. Jeffrey Baker, an oncologist.  The government countered with its own primary care and oncology experts, Drs. Gary Ferenchick and Russell Pachynski.

At the completion of Dayton's case-in-chief, the government made an ore tenus motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c), asserting that the Court lacked subject matter jurisdiction over any claims that fell under the Veterans Judicial Review Act (VJRA), 38 U.S.C. § 511.  (Doc. 105 at 80–81).  The government additionally moved for a judgment on the merits under Rule 52(c) on the grounds that Drs. Libert and Baker's testimony should be stricken from the record because their expert reports were largely drafted by Dayton's former counsel.  *Id.* at 83.[1]  The Court reserved ruling on both of these motions pending the parties' submission of their proposed findings of fact and conclusions of law once the trial was finished.  *Id.* at 83–84.

The parties thereafter filed their post-trial briefs in a timely manner.  (Docs. 112, 113).  In his memorandum, Dayton argues that the standard of care governing his treatment at the VA required his primary care doctors to engage in shared decision-making concerning how long he should be screened for prostate cancer given his advanced age and his previous exposure to Agent Orange during the Vietnam War. (Doc. 113).  Dayton further contends that the VA breached this standard of care and

---

[1] As discussed *infra*, the government raised these issues before trial by way of motions in limine (Docs. 49, 68), which the Court denied without prejudice (Docs. 82, 84).

that this breach caused him to be afflicted with incurable metastatic prostate cancer, which could have been avoided or at least controlled with less severe medical therapy had it been discovered earlier. *Id.* As a result of the VA's alleged negligence, Dayton requests $2,500,000 in damages to compensate him for both the deterioration in his quality of life and the likely hastening of his death brought on by his current medical condition. *Id.*

In response, the government argues in its memorandum that the standard of care did not necessitate shared decision-making regarding Dayton's prostate cancer screening after he turned seventy and that Dayton's primary care physicians acted well within the standard of care when they elected to stop screening him five years later at the age of seventy-five. (Doc. 112). As part of its defense to Dayton's allegations, the government also urges the Court to afford Drs. Libert and Baker's opinions less weight because of the heavy involvement Dayton's prior attorney had in compiling their reports. *Id.* The government argues as well that the existence of or adherence to any VA policies related to shared decision-making or prostate cancer screening is beyond the Court's subject-matter jurisdiction under the VJRA. *Id.*

Having considered the parties' respective submissions, along with the evidence adduced at trial, the applicable law, and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.[2] Unless otherwise indicated, the Court's factual findings are predicated upon its assessment of the weight of the

---

[2] To the extent that any finding of fact herein constitutes a conclusion of law, or vice versa, it is adopted as such.

evidence offered by the parties, including the testimony of the above-referenced witnesses.

## I.

Dayton, who was eighty-one years old at the time of trial, is a veteran of the United States Army.  (Doc. 104 at 10).  During his service, Dayton was exposed to Agent Orange[3] while stationed in Vietnam.  *Id.*  After Dayton's discharge from the military, he worked as a machinist and truck driver.  *Id.*

Dayton has obtained primary care from the Bay Pines VA hospital in St. Petersburg, Florida for more than twenty years.  *Id.* at 11–12.  During this period, Dayton was found to suffer from obesity, cataracts, macular degeneration, and infections in both his leg and foot; was diagnosed with anxiety, hyperlipidemia, high blood pressure, and gastroesophageal reflux disease; took daily medications to manage these and various other infirmities; and had a stent placed in his heart.  (Doc. 102 at 109–12, 121); (Doc. 103 at 84); (Doc. 104 at 32–33).

In addition to the care he received for these maladies, Dayton's primary care physicians at the VA regularly screened him for prostate cancer.  (Doc. 104 at 13). Prostate cancer develops in the prostate and can spread to adjacent organs and lymph nodes, often without presenting any symptoms.  (Doc. 102 at 31–32, 38).  Risk factors for prostate cancer generally include a family history of the disease, advanced age,

---

[3] Agent Orange is a mixture of herbicides that U.S. military forces sprayed in Vietnam during the war. *See Agent Orange*, BRITANNICA, https://www.britannica.com/science/Agent-Orange (last visited Sept. 30, 2024).

African American ancestry, and—according to some studies—exposure to Agent Orange. (Doc. 102 at 166); (Doc. 104 at 68, 75, 85); (Doc. 116-1).

Because prostate cancer can be asymptomatic, early detection depends upon screening. (Doc. 102 at 38). A clinician can screen for prostate cancer by digitally examining the inside of the patient's rectum to discern whether there are abnormalities with the prostate. (Doc. 104 at 70–71). This procedure is known as a digital rectal exam (DRE). *Id.* Although a standard screening method at one time, DREs have since been deemed ineffective. *Id.* at 70.

More typically today, a clinician screens for prostate cancer by testing the level of prostate-specific antigen (PSA) circulating in a patient's blood. (Doc. 105 at 96). PSA is an enzyme produced by the prostate that can indicate whether something has disturbed the gland. *Id.* at 96–97. PSA values that are 4.0 or below are considered normal. (Doc. 102 at 120, 126).

There are notable limitations to PSA testing, however. PSA levels tend to increase as men age and can fluctuate for various benign reasons, including urinary tract infections, extended bike riding, and sexual activity. (Doc. 105 at 96–97). Specific PSA results can also vary from machine to machine. *Id.* at 98. PSA screening therefore yields a high incidence of false positives, meaning that men with an abnormal PSA value will not actually have prostate cancer. (Doc. 104 at 61).

If a PSA test reveals that a man's PSA is worrisome, he will ordinarily be referred for a prostate biopsy. (Doc. 103 at 11–12, 39). A prostate biopsy is commonly taken through the rectum and involves the extraction of twelve separate tissue samples.

(Doc. 104 at 62, 89).  A prostate biopsy is invasive, painful, and can cause a patient to experience symptoms for roughly a month afterwards.  *Id.* at 89.  It can also lead to urosepsis in approximately 1 to 5% of cases.  *Id.*  Urosepsis is a type of sepsis which begins in the urinary tract and then spreads to the kidneys, and which can lead to multi-organ dysfunction, failure, and death.[4]

If prostate cancer is detected after a biopsy, the tumor is assigned a score on the Gleason scale.  (Doc. 102 at 42–43, 68–69).  Cancers with a Gleason score of seven to ten are referred to as "high-grade" and pose a greater risk of spreading—i.e., metastasizing—to other parts of the body, while cancers with a Gleason score of six are referred to as "low-grade" and present a lower risk of metastasis.  *Id.* at 42–43; (Doc. 105 at 108).  Higher grade prostate cancer tends to produce lower levels of PSA, so a patient may exhibit normal PSA values but still have metastatic prostate cancer. (Doc. 102 at 64); (Doc. 105 at 108).

Treatment for metastatic prostate cancer includes chemotherapy, immunotherapy, focused radiotherapy, and androgen-targeted drugs.  (Doc. 105 at 95–96).  The median survival for patients newly diagnosed with this condition is between five to seven years.  (Doc. 102 at 42–43); (Doc. 105 at 23–24, 113–14).

Localized prostate cancer, on the other hand, stays within the prostate capsule. (Doc. 102 at 31–32).  This type of cancer is typically treated with observation, radiation, or surgery, including removal of the prostate, which is known as a radical

---

[4] *See Health Library*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/25008-urosepsis (last visited Sept. 30, 2024).

prostatectomy.  (Doc. 104 at 90); (Doc. 105 at 90–91).  The side effects for treatment of localized cancer are usually milder than those for metastatic cancer, and a patient's life expectancy is longer.  (Doc. 105 at 113).  That said, men who undergo a radical prostatectomy have a 30 to 40% chance of incontinence, a 20 to 30% chance of erectile dysfunction, and up to a 1% chance of death from post-surgical complications.  (Doc. 104 at 90).

Because prostate cancer generally grows slowly, it may not cause harm or death. *Id.* at 61; (Doc. 116-1).  In other words, a patient may die *with* the disease not *because* of it.  (Doc. 104 at 61–62).  As a result, the benefits of treating prostate cancer may sometimes be outweighed by the downsides, such as erectile dysfunction, urinary incontinence, and uncomfortable bowel symptoms.  *Id.*; (Doc. 116-1).  This problem can arise when physicians "over-diagnose" and/or "over treat" prostate cancer.  (Doc. 104 at 61, 66).

To address this concern, leading professional medical organizations recommend that healthcare providers should ordinarily discontinue prostate cancer screening for older men.  *See*, *e.g.* (Doc. 116-1).  Although this guidance does not establish the standard of care, practitioners regularly follow it.  *See, e.g.,* (Doc. 102 at 161–63, 176); (Doc. 105 at 25).

The United States Preventive Services Task Force (USPSTF or Task Force) publishes one such set of screening guidelines.  (Docs. 116-1, 116-2).  The Task Force is comprised of sixteen preventive medicine, health maintenance, and methodology and evidenced-based medicine experts, who are appointed by the Secretary of Health

and Human Services and who voluntarily serve on the task force for four-year terms.[5] (Doc. 104 at 58, 97).  The Task Force analyzes "high-quality" data and information for and against screening interventions and supplies recommendations.  *Id.* at 58–60. In compiling these recommendations, the Task Force does not consider the financial costs of the treatment in question and instead focuses solely on patient care.  *Id.* at 60.

Screening recommendations rendered by the Task Force are predicated on evidence graded from "A" to "D" or "I."  *Id.* at 59; (Doc. 116–1).  Grades of "A" and "B" mean that the Task Force recommends the service; a grade of "C" means that the Task Force recommends "selectively offering or providing" the service "based on professional judgment and patient preference" because "[t]here is at least [a] moderate certainty that the net benefit is small;" a grade of "D" means that the Task Force recommends against the service because "[t]here is [a] moderate or high certainty that the service has no benefit or that the harms outweigh the benefits;" and a score of "I" means that there is not enough evidence to make a firm recommendation.  (Doc. 116–1 at 3).

The Task Force's guidelines for prostate cancer screening issued in 2012 and 2018—the 2012 Guidelines and the 2018 Guidelines, respectively—are relevant here. (Docs. 116-1, 116-2).  In the 2012 Guidelines, the Task Force assigned a grade of "D" to PSA-based screening for prostate cancer, meaning that the Task Force counseled against it.  (Doc. 116-2).  Notably, this recommendation applied to all men, regardless

---

[5] Two of these experts are affiliated with the VA.  (Doc. 104 at 100).

of age.  *Id.*  The 2012 Guidelines also described exposure to Agent Orange as "a risk factor for prostate cancer" but observed that "few data exist[ed] on the outcomes or effect of PSA testing and treatment" in persons subjected to this substance.  (Doc. 116-2 at 5).  The Task Force therefore did not propose any change in screening for men exposed to Agent Orange.  (Doc. 116-2).

The Task Force revised its screening recommendations in the 2018 Guidelines. (Doc. 116-1).  In those guidelines, the Task Force recognized that, as a general matter:

> [C]linical decisions involve more considerations than evidence alone. Clinicians should understand the evidence but individualize decision making to the specific patient or situation.  Similarly, the [Task Force] notes that policy and coverage decisions involve considerations in addition to the evidence of clinical benefits and harms.

(Doc. 116-1 at 2).

More particularly, the Task Force concluded that there was some benefit to PSA-based screening for men ages fifty-five to sixty-nine.  (Doc. 116-1).  The Task Force assigned this recommendation a grade of "C," meaning it found "[t]here [was] at least [a] moderate certainty that the net benefit [was] small" and that clinicians should "[o]ffer or provide [the] service for selected patients depending on individual circumstances."  *Id.* at 3.  The Task Force reasoned:

> For men aged [fifty-five] to [sixty-nine] years, the decision to undergo periodic PSA-based screening for prostate cancer should be an individual one and should include discussion of the potential benefits and harms of screening with their clinician.  Screening offers a small potential benefit of reducing the chance of death from prostate cancer in some men. However, many men will experience potential harms of screening, including false-positive results that require additional testing and possible

9

prostate biopsy; overdiagnosis and overtreatment; and treatment complications, such as incontinence and erectile dysfunction. In determining whether this service is appropriate in individual cases, patients and clinicians should consider the balance of benefits and harms on the basis of family history, race/ethnicity, comorbid medical conditions, patient values about the benefits and harms of screening and treatment-specific outcomes, and other health needs. Clinicians should not screen men who do not express a preference for screening.

*Id.* at 1.

On the other hand, the Task Force recommended against PSA-based screening for men once they reached the age of seventy. (Doc. 116-1). The Task Force assigned this recommendation a grade of "D," concluding "[t]here [wa]s [a] moderate or high certainty that the service ha[d] no net benefit or that the harms outweigh[ed] the benefits." *Id.* at 3. In support of its position, the Task Force observed that "[a]dequate evidence" from randomized clinical trials was consistent with there being no advantage to "PSA-based screening for prostate cancer on prostate cancer mortality in men [seventy] years and older." (Doc. 116-1 at 1–2). The Task Force went on to explain that the rates of overdiagnosis of prostate cancer "would be expected to increase with age and to be highest in men [seventy] years and older because older men have [a] high risk of death from competing causes." *Id.* at 3. The Task Force accordingly suggested that clinicians "discourage" the use of PSA-based screening for this age group. (Doc. 116-1). The Task Force acknowledged, however, that given "the common use of PSA-based screening in practice today[,] . . . some older men will continue to request screening and some clinicians will continue to offer it." *Id.* at 5.

10

The Task Force also recommended in the 2018 Guidelines against DREs for men of any age due to the lack of evidence of any benefits. (Doc. 116-1). Of import here, the Task Force did not recommend any differential screening for men exposed to Agent Orange or even mention Agent Orange at all. *Id.*

Other professional organizations have issued the same or similar guidance for prostate cancer screening as that propounded by the USPSTF. The American Academy of Family Physicians, for example, adopted the 2018 Guidelines and reprinted them in the *American Family Physician*. (Doc. 103 at 83). The National Cancer Institute likewise recommends that prostate cancer screening cease at age seventy, while the American Urological Association proposes screening until age seventy, and possibly age seventy-four. (Doc. 104 at 71–73). And the medical resource *UpToDate*, which publishes a consensus of journal articles addressing distinct areas of medicine, suggests screening for prostate cancer until age seventy-five. (Doc. 102 at 82, 139).

The VA has not promulgated its own policy governing prostate cancer screening. *Id.* at 82, 160–61. Broadly speaking, however, the VA promotes what is known as the SHARE approach, which instructs physicians to explain the risks and benefits of medical decisions with their patients. (Doc. 105 at 13). Such decisions may include whether to screen for prostate cancer. (Doc. 102 at 37).

In this case, Dayton's primary care physicians at the VA screened him for prostate cancer by way of a PSA-based test from 2003, when he was sixty, to March

11

2018, when he was seventy-five.  (Doc. 115-1 at 457–60).  As displayed in the below chart, all of Dayton's PSA levels during this time frame were normal and, in fact, low.

| Date | PSA |
|---|---|
| July 3, 2003 | 0.70 |
| August 12, 2004 | 0.40 |
| August 15, 2005 | 0.40 |
| August 23, 2006 | 0.40 |
| August 9, 2007 | 0.40 |
| October 14, 2008 | 0.50 |
| March 8, 2010 | 0.50 |
| June 7, 2011 | 0.40 |
| July 20, 2012 | 0.50 |
| July 24, 2014 | 0.40 |
| May 20, 2014 | 0.40 |
| May 1, 2015 | 0.50 |
| December 30, 2015 | 0.50 |
| September 5, 2017 | 0.50 |
| March 1, 2018 | 0.71 |

*See* (Doc. 115-1 at 457–60).

Dr. Hunt—who is board certified in family medicine—served as Dayton's primary care physician at the VA from August 2016 to March 2019. (Doc. 102 at 74–75, 83). Dr. Hunt ordered PSA tests for Dayton while he was under his care, which as shown above, yielded results of less than 1.0. *Id.* at 84.

In September 2017, Dayton complained to Dr. Hunt about blood in his ejaculate. *Id.* at 125. Dr. Hunt testified that this problem is almost always benign. *Id.* at 126. Nonetheless, Dr. Hunt ordered an additional PSA screening and a urinalysis at Dayton's next visit in March 2018. *Id.* at 126–27.

As reflected above, Dayton's March 2018 screening revealed a PSA of 0.71, which represented an increase from his result of 0.50 in September 2017. *Id.* at 127. Dayton's PSA was still well-within normal range, however, and he did not mention blood in his ejaculate going forward. *Id.* at 128. Dayton's urinalysis results were also unexceptional. *Id.* at 127.

Dr. Hunt testified that because Dayton's PSA had not changed significantly since 2003, when it was 0.70, and because Dayton was then seventy-five, he did not order further PSA screening after March 2018. *Id.* at 95, 128. Dr. Hunt explained that Dayton's "PSA numbers [of less than one] were that of a young man," which was unusual given Dayton's advanced age. *Id.* at 126. Dr. Hunt further explained that it was his practice to screen men for prostate cancer only until age seventy-five based on the medical resource, *UpToDate*. *Id.* at 82.

Dr. Hunt's records, however, do not indicate that he discussed this matter with Dayton, although he testified that it was his regular practice to advise his patients

13

about the age at which they should stop prostate cancer screening. *Id.* at 81–83. When asked by Dayton's counsel about whether such a conversation occurred, Dr. Hunt agreed that it was fair to infer that it did not. *Id.* at 83. For his part, Dayton testified that no physician at the VA ever told him that PSA testing would terminate and that he believed screening had continued. (Doc. 104 at 13–14).

In September 2019, Dr. Saifullah assumed care of Dayton at the VA. (Doc. 102 at 191–92). Dr. Saifullah, who is also board certified in family medicine, saw Dayton at his annual visit in March 2020 when Dayton was seventy-seven. *Id.* at 159. Like Dr. Hunt, Dr. Saifullah did not review prostate cancer screening with Dayton or order a PSA test. *Id.* at 188–89. Similar to Dr. Hunt's thinking as well, Dr. Saifullah explained that Dayton was well above the "screening age" and had normal PSA tests before then. *Id.* at 189. According to Dr. Saifullah, she engaged in shared decision-making regarding prostate cancer screening with men from ages fifty-five to sixty-nine but not past that age given the potential harms. *Id.* at 178–80.

In February 2021, Dr. Perez—another board-certified family medicine physician—took over Dayton's care at the VA. (Doc. 105 at 6, 14). Dr. Perez did not order a PSA test to be conducted at that time, nor did he discuss screening with Dayton.[6] *Id.* at 51. Dr. Perez testified at trial that he did not deem a PSA test to be

---

[6] Dr. Perez did order a PSA test for Dayton to occur the following year in February 2022. (Doc. 105 at 14–15). Dr. Perez explained at trial, however, that he did not remember doing so and that it was likely a mistake. *Id.* at 15–16, 49. I found this testimony credible.

indicated in 2021 because of Dayton's age, which was then seventy-eight. *Id.* at 15–16.

Following Dayton's routine visit with Dr. Perez in February 2021, Dayton presented to the Bay Pines VA Hospital in October 2021 with urinary retention and a urinary tract infection. (Doc. 103 at 109, 118). Dr. Camuzzi, a urologist, treated Dayton's infection with antibiotics and utilized a catheter to relieve his bladder. *Id.* at 110. After the infection cleared, Dr. Camuzzi performed a cystoscopy of Dayton's bladder,[7] which revealed an irregular growth later determined to be prostate cancer. *Id.* at 110, 118, 123.

Dr. Camuzzi ordered a PSA test so that he could monitor the progress of his treatment of Dayton. *Id.* at 126. Dayton's PSA turned out to be 38.9, which was well outside the normal range. *Id.* Dr. Camuzzi acknowledged at trial that prostate cancer could have caused this higher PSA but cautioned that PSA values can also be markedly elevated during the approximately four weeks after a procedure is performed or an instrument is employed, like the catheter he inserted into Dayton's bladder. *Id.* at 126–27, 129.

Dr. Camuzzi ordered further imaging, which confirmed multiple areas of activity consistent with metastatic prostate cancer. *Id.* at 125. Dayton's tumor was assigned a Gleason score of nine, and he was diagnosed with Stage IV metastatic

---

[7] A cystoscopy is a local endoscopic procedure in which a scope equipped with a camera is inserted through the urethra. (Doc. 103 at 110).

prostate cancer.  *Id.* at 123, 140.  At that point, the cancer had spread to Dayton's bladder, lymph nodes, and bones.  *Id.* at 111, 147.

Dr. Pradhan, who is board certified in oncology and hematology, has managed Dayton's care at the VA since his cancer diagnosis.  *Id.* at 135–37.  Dr. Pradhan testified that Dayton's cancer was not curable but could be treated.  *Id.* at 141.  Dr. Pradhan initially prescribed anti-androgen therapy along with other medications, the latter of which varied in effectiveness.  *Id.* at 147–49.  Dayton was subsequently enrolled in a clinical trial but did not respond to the prescribed drug.  *Id.* at 149–50.  In November 2023, Dayton began a regime of chemotherapy, along with injections to maintain his white blood cell count.  *Id.* at 150–51.  Dr. Pradhan explained that, after chemotherapy, some patients go into remission for months or even years but that there is no way to predict the outcome.  *Id.* at 152–53.

According to Dr. Pradhan, Dayton has tolerated chemotherapy well, and his PSA is trending down.  *Id.* at 150, 153.  Dr. Pradhan further advised that Dayton has not complained of nausea, fatigue, drowsiness, or hot flashes, and that he has presented to the office in good spirits.  *Id.* at 154–55.  In addition, Dr. Pradhan testified that Dayton scored a "0" on the Eastern Cooperative Oncology Group (ECOG) scale, which measures a patient's level of functioning.  (Doc. 105 at 101–02).  This low ECOG value indicates that Dayton can perform daily activities without any real effects from cancer or treatment.  *Id.*

At trial, Dayton painted a bleaker picture of how his prostate cancer has impacted him. Dayton testified that before his cancer was diagnosed, he was very active for his age and felt "like [he] was in [his] 40s or 50s, energy-wise." (Doc. 104 at 23). Dayton likewise described his life before cancer as "wonderful" and said he enjoyed an active lifestyle. *Id.* at 23, 49. By contrast, Dayton advised that he now suffers from fatigue and chronic pain and must wear a diaper to manage his incontinence. *Id.* at 24, 26.

As a result of his diagnosis, Dayton receives 100% disability from the VA. *Id.* at 45–46. This is because prostate cancer is one of nineteen conditions presumptively associated with Agent Orange for purposes of VA disability benefits purposes.[8] (Doc. 103 at 71–72); (Doc. 104 at 82). Thus, veterans exposed to Agent Orange who have been diagnosed with prostate cancer or another presumptive condition are entitled to VA disability payments without having to prove any connection between Agent Orange and their affliction. (Doc. 112 at 12).

Although the VA has paid for all of Dayton's medical treatment, Dayton—as noted above—seeks $2.5 million in damages. (Doc. 104 at 45, 47); (Doc. 113). According to Dayton, this amount represents a life expectancy shortened by three years (valued at $500,000 per year) and also includes $1 million in pain, suffering, and the loss of enjoyment in life. (Doc. 113).

---

[8] Other presumptive conditions include type II diabetes, hypertension, ischemic heart disease, lung cancer, bladder cancer, and Parkinson's disease. (Doc. 104 at 82); (Doc. 103 at 72).

To buttress his claims of medical negligence, Dayton elicited the testimony of two expert witnesses, Drs. Libert and Baker, who—as noted earlier—are a primary care provider and an oncologist, respectively.  Dr. Libert practices as a family physician three days a week and serves as a medical expert the other two days.  (Doc. 103 at 8).  Dr. Libert testified that based on his education, training, and experience, the standard of care required Dayton's primary care physicians to discuss with him whether to persist with his prostate cancer screening, especially given his age and prior exposure to Agent Orange.  *Id.* at 24, 54–55, 66.  Dr. Libert derived support for his position from the portion of the 2018 Guidelines that instructs clinicians to "individualize decision-making to the specific patient or situation," which Dr. Libert interpreted to mean that shared decision-making about prostate cancer screening was necessary even after Dayton turned seventy due to his personal circumstances.  *Id.* at 32–33.  Dr. Libert also derived support for his position from the part of the 2018 Guidelines which mentioned that men older than seventy may request screening.  *Id.* at 34.  Dr. Libert extrapolated from this remark that there must be a discussion in anticipation of such requests, whereby patients are informed of the potential harms and benefits of screening.  *Id.* at 35.

Dr. Libert testified as well that whether a patient was subjected to Agent Orange should be part of this conversation too and that it would be a violation of the standard of care not to review this risk factor with the patient.  *Id.* at 54–55.  In this regard, Dr. Libert referenced a 2013 study titled, "Agent Orange as a Risk Factor for High-Grade Prostate Cancer," conducted by *Ansbaugh*.  *Id.* at 44–45, 76.  The *Ansbaugh* study

18

examined the connection between Agent Orange exposure and the risk of detecting high-grade prostate cancer.  *Id.* at 47.  According to Dr. Libert, the *Ansbaugh* study found that Agent Orange exposure was associated with a 2.1-fold increase in cancer among men who underwent prostate biopsies.  *Id.* at 46, 48–49, 76.

Dr. Libert also referenced a study titled "Agent Orange Exposure, Vietnam War Veterans, and the Risk of Prostate Cancer," that was published in July 2008 by *Chamie* in the oncology journal *Cancer*.  *Id.* at 51, 72–73.  Dr. Libert described the *Chamie* study as concluding that individuals subjected to Agent Orange had an increased incidence of prostate cancer, developed the disease at a younger age, and had a more aggressive variant than their unexposed counterparts.  *Id.* at 53.  Dr. Libert interpreted the *Chamie* study to mean that veterans who had come in contact with Agent Orange should be considered to be at a high risk for prostate cancer similar to African American men and those with a family history of the disease.  *Id.* at 53.

As for Dr. Baker, he testified that he regularly treats men diagnosed with prostate cancer and that, based on his education, training, and experience, the elevation in Dayton's PSA from 0.50 in September 2017 to 0.71 in March 2018 indicated a high rate of rise, or PSA velocity.  (Doc. 102 at 25, 34–35, 51).  According to Dr. Baker, if Dayton's PSA had continued to increase at this pace, he should have been referred to a urologist.  *Id.* at 36.  Dr. Baker conceded, however, that without a follow-up PSA test, he could not determine whether the change in Dayton's PSA from 0.50 to 0.71 was due to a benign fluctuation or to cancer.  *Id.* at 63.  Dr. Baker also admitted that he does not use PSA tests in his practice to screen for cancer but only to

assess if prostate cancer is responding to treatment.  *Id.* at 62–63.  Nevertheless, Dr. Baker opined that had Dayton's cancer been discovered sooner, other milder treatments—such as a prostatectomy or radiation therapy—would have been available to him.  *Id.* at 41–42.[9]

In response to the testimony of Drs. Libert and Baker, the government offered the testimony of Drs. Ferenchick and Pachynski.  Dr. Ferenchick practices and teaches internal medicine.  (Doc. 104 at 55–56).  Dr. Ferenchick opined that shared decision-making relating to PSA screening was not necessary after age seventy and that it was within the standard of care to cease screening Dayton at that time.  *Id.* at 79, 111.  Dr. Ferenchick explained in this respect that there was no "legal, ethical, or moral obligation to engage in shared decision-making . . . for an intervention that's either proven to be ineffective or proven to be harmful."  *Id.* at 78.  Dr. Ferenchick similarly testified that the standard of care does not demand a physician to "offer a service in which the net benefit is equal to the net harm or where the harm of the intervention is greater than the benefit."  *Id.* at 114.  In reaching these conclusions, Dr. Ferenchick considered the 2018 Guidelines, as well as his thirty years of clinical practice and academic work.  *Id.* at 58–59.

With respect to Agent Orange, Dr. Ferenchick testified that the leading professional organizations did not recommend differential screening based on Agent

---

[9] Dr. Baker testified at one point that the failure by Dayton's primary care doctors to engage in shared decision-making about prostate cancer screening violated the standard of care.  (Doc. 102 at 37–38, 51).  Dr. Baker later acknowledged, however, that he could not offer an opinion on this issue because he practiced oncology.  *Id.* at 64.  The Court therefore disregards this aspect of Dr. Baker's testimony.

Orange exposure. *Id.* at 71–72. According to Dr. Ferenchick, these groups included not only the USPSTF, but also the American Cancer Society, the American Academy of Family Physicians, the National Comprehensive Cancer Care Network, the National Cancer Institute, and the American Urological Association. *Id.* at 71–72. Dr. Ferenchick stated, however, that some studies have suggested a positive association between Agent Orange exposure and prostate cancer but noted that other studies have found no link at all. *Id.* at 73–74. Along the same lines, Dr. Ferenchick testified that the American Cancer Society mentioned Agent Orange as a risk factor, albeit one with a less clear connection to prostate cancer, like diet and smoking. *Id.* at 72.

As for Dr. Pachynski, he testified that he treats patients and runs a lab focused on prostate cancer. (Doc. 105 at 89). Echoing Dr. Ferenchick's assessments on the matter, Dr. Pachynski testified that there is a conflict in the medical literature as to whether there is an association between Agent Orange and prostate cancer. *Id.* at 99. According to Dr. Pachynski, some studies have shown a higher correlation between the two but there is "still no causative link." *Id.* at 99.

## II.

Where, as here, a case is tried without a jury, Rule 52 directs that a "court must find the facts specially and state its conclusions of law separately," either on the record after the close of evidence or in an opinion filed by the court. Fed. R. Civ. P. 52(a). The court may also make partial findings on a claim or defense heard during a bench trial, although it may decline to render any judgment until the close of evidence. Fed.

R. Civ. P. 52(c).  Ultimately, the court must enter a judgment predicated on its findings.  Fed. R. Civ. P. 52(a).

A court's "findings of fact must be sufficient to allow the reviewing court 'an opportunity to engage in meaningful appellate review.'" *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1080 (11th Cir. 2021) (quoting *Danley v. Allen*, 480 F.3d 1090, 1091 (11th Cir. 2007)).  That said, Rule 52 does not necessitate "a finding on every contention raised by the parties," *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987), or call upon a court to engage in an "'overelaboration of detail or [a] particularization of facts,'" *On Point Cap. Partners*, 17 F.4th at 1081 (quoting *Stock Equip. Co. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990)).  Rather, a court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters.'"  *Id.* (quoting *Stock Equip. Co.*, 906 F.2d at 592).

In rendering such findings, a "court must weigh the evidence and may consider the witnesses' credibility."  *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir. 1993) (quoting *Chris Berg, Inc. v. Acme Min. Co., Inc.*, 893 F.2d 1235 (11th Cir. 1990) (per curiam)).  In doing so, a court must "resolve[ ] the disputed issues on the basis of the preponderance of the evidence, without drawing any special inferences in favor of the plaintiff."  *JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F. Supp. 2d 1205, 1209 (N.D. Fla. Aug. 6, 2010) (citation omitted).

On appeal, a court's "findings of fact—including [its] determinations of the credibility of witnesses and [the] weight of the evidence"—will be upheld unless they are clearly erroneous.  *Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1201 (11th Cir.

22

2016) (quoting *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007)); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").  The burden imposed upon the party seeking to overturn a court's findings on appeal is "especially heavy" where the evidence is "largely testimonial" and the court had "the advantage of observing the witnesses and evaluating their credibility firsthand." *Sidman*, 841 F.3d at 1201 (quoting *Fischer*, 508 F.3d at 592).  Legal conclusions, on the other hand, are reviewed on appeal de novo. *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015) (citing *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009)).

III.

The government's argument that the VJRA prohibits judicial review of the existence of or adherence to VA policies presents a threshold jurisdictional question, so the Court commences its analysis there.  It is well settled that claims which allege VA healthcare providers breached a medical standard of care are generally cognizable under the FTCA. *See United States v. Brown*, 348 U.S. 110, 113 (1954) (concluding that a veteran could sue the VA for medical negligence under the FTCA); *Smith v. United States*, 7 F.4th 963, 986–88 (11th Cir. 2021).  The FTCA confers exclusive jurisdiction on federal courts to hear such claims against the United States. 28 U.S.C. § 1346(b)(1).

By its terms, however, the VJRA bars judicial review of a decision by the Secretary of the Department of Veterans Affairs that "affects the provision of benefits"

23

to veterans. *Smith*, 7 F.4th at 965 (quoting 38 U.S.C. § 511(a)).[10] Such benefits decisions by the Secretary must instead "be appealed only to the Board of Veterans' Appeals, [38 U.S.C.] § 7104(a), then to the United States Court of Appeals for Veterans Claims, *id.* at §§ 7252(a), 7266(a), then to the United States Court of Appeals for the Federal Circuit, *id.* at § 7292(a),(c), and, finally, to the United States Supreme Court, *id.* at § 7292(c)." *Peeples v. United States Dep't of Veterans Affs.*, 2016 WL 7383357, at *3 (M.D. Fla. 2016), *report and recommendation adopted in part*, 2016 WL 7374552 (M.D. Fla. Dec. 20, 2016).

The scope of the VJRA is "broad," and courts have consistently held that it encompasses "constitutional or tort claims whose resolution would require the court to intrude upon the VA's exclusive jurisdiction." *Andrews v. Sec'y, Dep't of Veterans Affairs*, 845 F. App'x 880, 883–84 (11th Cir. 2021) (per curiam) (internal quotation marks and citation omitted).[11] In deciding whether a cause of action falls within this

---

[10] Specifically, the VJRA states as follows:

(a) The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.

(b) The second sentence of subsection (a) does not apply to--

(1) matters subject to section 502 of this title;

(2) matters covered by sections 1975 and 1984 of this title;

(3) matters arising under chapter 37 of this title; and

(4) matters covered by chapter 72 of this title.

38 U.S.C. § 511.

[11] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

24

category, a court must focus "on the gravamen of the claim, rather than [on] its label." *Id.* at 884.

In *Smith*, the Eleventh Circuit considered the parameters of the VJRA as it pertained to a medical negligence claim against the VA, which the plaintiff ostensibly brought under the FTCA. *Smith*, 7 F.4th at 965. In that case, the plaintiff filed suit against VA medical professionals who he claimed failed to diagnose his throat cancer and immediately treat it. *Id.* Upon the government's motion, the district court dismissed the plaintiff's claims for lack of subject matter jurisdiction under the VJRA. *Id.* The Eleventh Circuit affirmed in part and reversed in part, finding that the district court lacked jurisdiction over some of the plaintiff's claims but not others. *Id.*

The Eleventh Circuit divided the plaintiff's claims into two categories—those precluded by the VJRA and those permitted by the FTCA. The court described the causes of action foreclosed by the VJRA as including "[t]he approval and authorization of a particular treatment or the payment thereof," and whether "such approval or authorization occurred in a timely manner." *Id.* at 986; *see also Milbauer v. United States*, 587 F. App'x 587, 591 (11th Cir. 2014) (per curiam) (affirming the dismissal of an action for lack of subject matter jurisdiction under the VJRA where the plaintiff "sought a particular benefit—to have the VA pay for an open MRI performed at a non-VA facility—and he complained the process of obtaining that benefit caused the delay in his diagnosis"). The court also explained that "if the district court lack[ed] jurisdiction to review the VA's approval, authorization, and scheduling decisions, it .

25

. . also lack[ed] jurisdiction to determine whether the VA followed its own internal procedures in making those decisions." *Smith*, 7 F.4th at 986.

On the other hand, the court in *Smith* deemed "claims that the VA's medical personnel negligently failed to diagnose [the plaintiff's] cancer, recognize the severity of his medical condition, properly treat his cancer by immediate surgery, and to generally manage, coordinate, and monitor [the plaintiff's] medical care" could be determined by a federal court under the FTCA. *Id.* at 986–87; *see also Tunac v. United States*, 897 F.3d 1197, 1205–06 (9th Cir. 2018) (stating that the court had jurisdiction to hear claims averring that the "VA failed to properly order tests and/or evaluate [the veteran's] recurring lupus condition," did not provide "adequate follow-up care and treatment to monitor [the veteran's] condition," and did not "identify any potential relapses or adverse changes to his health"); *Anestis v. United States*, 749 F.3d 520, 527 (6th Cir. 2014) (reversing the district court's dismissal of a complaint against the VA for failure to treat a suicidal veteran because the plaintiff did "not argue that [the veteran] should have been eligible for VA benefits; instead, [the plaintiff] argue[d] that the VA violated standards of medical care and its own policies by refusing treatment when [the veteran] presented himself at two VA facilities in a state of emergency"). The *Smith* court thus concluded that if a plaintiff's allegations of medical negligence "do not require [a] court to decide whether [he] was 'entitled to benefits,'" or to "'revisit any decision made by the Secretary *in the course of making* benefits determinations,'" then the court has jurisdiction over those averments. *Smith*, 7 F.4th

26

at 987 (quoting *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1025 (9th Cir. 2012) (en banc)).

Here, as noted, the government argues that the existence of or adherence to VA policies is beyond the Court's subject matter jurisdiction. (Doc. 112 at 32). The government, however, does not cite any case law that bolsters this assertion, nor does it articulate how the evidence submitted fits into the rubric set out by *Smith*. *Id.* The government's perfunctory treatment of this question does not comport with the Court's Order directing the parties to include all arguments and legal authority in their post-trial submissions (Doc. 101)[12] and also amounts to a waiver on the matter. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."), *overruled on other grounds in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015); *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir. 2003) (finding an issue to be abandoned where no meaningful argument was made) (citations omitted).

Even were the Court not to find a waiver, the government's VJRA claim would fail in any event. The focus of the government's argument is on trial testimony elicited by Dayton's counsel relative to two discrete issues—whether the VA followed the

---

[12] In its Order, the Court instructed the parties that their findings of fact and conclusions of law should contain all facts and legal authority for the Court's consideration and should not incorporate by reference any prior memoranda submitted to the Court. (Doc. 101). Further, the Court cautioned the parties that a failure to include a factual or legal argument in their memoranda would constitute a waiver on the issue, even if the issue was raised in a previous filing. *Id.*

SHARE approach and whether VA policy requires a PSA and DRE to be obtained before referring a patient for a urology work up.  (Doc. 112 at 32).  Starting with the government's objection to the SHARE proof, Dr. Libert testified that this protocol generally involves a doctor discussing a medical decision with his patient in advance, which "is something that the VA promotes."  (Doc 103 at 55–56).  Dr. Libert also testified that SHARE "meets the standard of care" and that it was not followed by the VA with respect to Dayton's PSA testing.  *Id.* at 23, 56–57.[13]

Dayton's counsel additionally adduced testimony from Dr. Perez that VA policy requires a physician to order a PSA test and perform a DRE before referring a patient to the urology department.  (Doc. 105 at 52).  Dr. Perez testified that the VA did not widely adhere to this policy as well.  *Id.* at 52–53.  Dayton did not directly reference this testimony in his post-submission briefing.  (Doc. 113).

The challenged evidence is not prohibited by the VJRA.  Contrary to the government's suggestion (Doc. 112 at 32), the gravamen of Dayton's case is not whether he was entitled to the benefit of continued prostate cancer screening after age seventy-five, either by means of a PSA test or a DRE, *Smith*, 7 F.4th at 987.  And while Dayton maintains that the SHARE approach necessitated a discussion about prostate cancer screening, Dayton does not frame such a conversation as a "benefit" that the VA denied him but as evidence of the normally applicable standard of care.

---

[13] The exact contours of the SHARE approach are somewhat unclear because the underlying document was not admitted into evidence following the government's objection.  (Doc. 102 at 78–80).

The VA's approval or authorization of a prostate cancer screening test, or policies governing such tests, is simply not in question here. *Id.*

Rather, Dayton's claim turns on whether his VA physicians failed to review with him the advantages and disadvantages of ending his prostate cancer screening given his risk factors. *Id.* As such, Dayton has properly brought a tort claim for medical negligence under the FTCA, as opposed to a claim for benefits that compels review through the VA's administrative appeals process. *Id.* at 985–87.

## IV.

Having confirmed that it has subject matter jurisdiction, the Court proceeds to the merits of Dayton's tort claims. Sovereign immunity ordinarily protects the federal government and its agencies from civil liability. *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA, however, provides a limited waiver of this immunity for tort claims "caused by the negligent or wrongful act or omission of any employee of the [g]overnment while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *see also Motta ex rel. A.M. v. United States*, 717 F.3d 840, 843 (11th Cir. 2013).

Under the FTCA, the United States is liable "to the same extent as a private individual . . . [pursuant to] the law of the [state] where the tort occurred," which in this case is Florida. *Levin v. United States*, 568 U.S. 503, 506–07 (2013) (internal quotation marks and citation omitted); *see also Stevens v. Battelle Mem'l Inst.*, 488 F.3d 896, 899 n.3 (11th Cir. 2007) (explaining that "liability in an FTCA action is determined in accordance with the law of the place where the government's act or

omission occurred").  To succeed on a claim for negligence under Florida law, a plaintiff must prove "that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing *Paterson v. Deeb*, 472 So. 2d 1210, 1214 (Fla. Dist. Ct. App. 1985)).  A plaintiff must establish each of these elements by a preponderance of evidence, meaning "more likely than not." *Saunders v. Dickens*, 151 So. 3d 434, 441–42 (Fla. 2014).

A physician's duty of care to a patient requires him to act within the prevailing standard of professional care.  Fla. Stat. § 766.102 (2013).  The prevailing standard of care for a physician practicing in Florida is defined as "that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers."  Fla. Stat. § 766.102(1).  In a medical malpractice case, the standard of care is typically determined through expert testimony. *Pate v. Threlkel*, 661 So. 2d 278, 281 (Fla. 1995). To show a breach of the applicable standard of care, a plaintiff must demonstrate that the actions of the health care provider at issue did not meet this threshold.  Fla. Stat. § 766.102(1).

As for causation, a plaintiff must establish that the defendant's negligence "probably caused the plaintiff's injury." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014); *see also Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (explaining that the plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of

the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough") (quoting PROSSER, LAW OF TORTS § 41 (4th ed. 1971)). Stated another way, a "plaintiff must show that what was done or failed to be done probably would have affected the outcome." *Chiarino v. United States*, 189 F. Supp. 3d 1371, 1384 (S.D. Fla. 2016) (citing *Santa Lucia v. LeVine*, 198 So. 3d 803, 809 (Fla. Dist. Ct. App. 2016)). While a defendant may attempt to rebut a plaintiff's causation proof by offering evidence of possible explanations other than the defendant's own negligence, the burden never shifts to the defendant on this element. *Aycock*, 769 F.3d at 1069 (citing *Haas v. Zaccaria*, 659 So. 2d 1130, 1133 (Fla. Dist. Ct. App. 1995)).

In resolving these issues, a court sitting as fact finder is "free to determine the credibility of experts and, where there is conflicting evidence, the weight to attach to their opinions." *Porras v. United States*, 2023 WL 2583303, at *24 (M.D. Fla. Mar. 21, 2023) (quoting *Vorsteg v. Thomas*, 853 So. 2d 1102, 1103 (Fla. Dist. Ct. App. 2003)). And "[e]ven when expert testimony is unchallenged, the finder of fact is free to weigh the opinion, just as it does with any other witness, and reject such testimony." *Id.* (quoting *Dep't of Agric. & Consumer Servs. v. Bogorff*, 35 So. 3d 84, 88 (Fla. Dist. Ct. App. 2010)). A decision to disregard expert testimony, however, "must be founded on some reasonable basis in the evidence," such as:

> conflicting medical evidence, evidence that impeaches the credibility or basis for an expert's opinion; lack of candor of the plaintiff in disclosing prior accidents, prior medical treatment, and prior or subsequent similar injuries; conflicting lay testimony or evidence that disputes the injury

claim; or the plaintiff's overall credibility relating to conflicting statements regarding the alleged injury.

*Perez v. United States*, 2022 WL 909763, at *9 (M.D. Fla. Mar. 29, 2022) (quoting *Boyles v. A & G Concrete Pools, Inc.*, 149 So. 3d 39, 48 (Fla. Dist. Ct. App. 2014)).

A court may also evaluate the credibility of an expert by considering the expert's involvement in drafting the report required by Rule 26(a). *Gov't Employees Ins. Co. v. Seco*, 658 F. Supp. 3d 1162, 1171–72 (S.D. Fla. 2023). Rule 26(c) directs a federal litigant to disclose the opinions of an expert witness in "a written report" which is "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). Although Rule 26(a) contemplates some contributions by counsel, Fed. R. Civ. P. 26, advisory committee notes to 1993 amendment ("Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports. . . ."), most courts to confront the question have found that Rule 26(a) demands an expert "substantially participate[ ]" in preparing the report, *see Govt. Employees Ins. Co. v. Right Spinal Clinic, Inc.*, 608 F. Supp. 3d 1184, 1187–88 (M.D. Fla. 2022) (collecting cases). And where an opposing party contests the extent to which an expert crafted the report, courts have allowed cross-examination on the issue as a manner of attacking the expert's credibility. *See, e.g., Seco*, 658 F. Supp. 3d at 1172 (instructing a party that it could use cross examination to establish that an expert did not draft his report) (citations omitted); *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 830309, at *7 (N.D. Fla. Mar. 4, 2021) (explaining that where "an expert witness 'substantially participates in the preparation of his report,' and the report reflects his 'actual views,' the fact that

32

he received assistance in developing his opinions is a matter of weight and credibility, not admissibility") (citations omitted); *Tindall v. H & S Homes, LLC*, 2012 WL 3241885, at *1–3 (M.D. Ga. Aug. 7, 2012) (finding that issues as to whether an expert substantially prepared a report, which was crafted by the attorney but reviewed and modified by the expert, were appropriately considered as part of the expert's credibility and reliability).[14]

With these principles in mind, the Court must now define the applicable standard of care in this case and determine whether Dayton's primary care physicians breached it. Relying on the testimony of Drs. Libert and Baker, Dayton asserts that the standard of care obligated his primary care doctors to discuss with him the benefits and risks of PSA testing or a DRE given his age and exposure to Agent Orange before terminating such screening. (Doc. 113 at 4, 18). Referencing Dr. Ferenchick's

---

[14] Courts have also stricken expert reports under Rule 26(a) predicated upon evidence that the experts did not meet the strictures of the rule. *See, e.g., Right Spinal*, 608 F. Supp. 3d at 1188–90 (striking an expert report, in part, because the expert "did not contribute a single word to the [r]eport," did not "participate in the drafting process with . . . counsel," and spent at most two hours reviewing the draft without editing it); *but see United States v. Kalymon*, 541 F.3d 624, 637–38 (7th Cir. 2008) (explaining that the only requirement the rules impose "is that an expert submit a written report signed and prepared by the witness" and that the report contain a complete statement of all opinions to be expressed and the reasons therefor). As alluded to previously, the government moved before the trial to exclude the testimony of Drs. Libert and Baker on the grounds that they did not prepare their written reports. (Doc. 49). As also alluded before, the Court denied this motion without prejudice but told the government that it could raise its concerns again at trial. (Doc. 82). At trial and as noted above as well, the government likewise moved for a judgment on the merits under Rule 52 based on its contention that Drs. Libert and Baker's testimony should be excluded. (Doc. 105 at 83). In its post-trial submission, however, the government no longer asks that the Court strike Drs. Libert and Baker's opinions and instead simply attacks their credibility. (Doc. 112 at 31–32). Thus, under the Court's briefing Order and the governing case law, the government has waived its prior request to exclude all testimony by Drs. Libert and Baker. *See Hamilton*, 680 F.3d at 1319; *Mendoza*, 327 F.3d at 1286 n.3; (Doc. 101).

opinion, the government counters that shared decision-making regarding prostate cancer screening is not necessary after a patient reaches the age of seventy because, at that point, the net benefit is equal or less than the harm caused by intervention. (Doc. 112 at 10–11). For the reasons set forth below, the Court finds the opinions of the government's experts more credible than the opinions of Dayton's experts and that Dayton fails to prove a breach of the standard of care by the greater weight of the evidence.

To begin, as discussed earlier, Dr. Libert largely looked to the 2018 Guidelines to bolster his opinion that the standard of care obligated Dayton's physicians to engage in shared decision-making even after Dayton passed the age of seventy-five. (Doc. 103 at 20–21, 24, 32); (Doc. 116-1 at 5). The plain language of the 2018 Guidelines, however, does not buttress Dr. Libert's view. As also described above, those Guidelines are predicated on "high–quality evidence" (Doc. 104 at 58), including randomized clinical trials, which—the evidence at trial revealed—are the "gold standard" in medical research (Doc. 102 at 82). The 2018 Guidelines explicitly discourage DREs for a man of *any* age and counsel against PSA-based tests for men older than sixty-nine. (Doc. 116-1). And while the 2018 Guidelines arguably suggest a response be supplied if a man aged seventy or older requests a PSA test, the Task Force ultimately recommends that PSA-based screening should not be offered to men in this age group. *Id.*

This guidance is in stark contrast to the Task Force's recommendation that clinicians should discuss prostate cancer screening with men aged fifty-five to sixty-

34

nine, for whom the decision to undergo periodic PSA-based screening "should be an individual one." (Doc. 116-1 at 1).  The Task Force advises that unlike males who are more elderly, men in this younger age category "should have an opportunity to discuss the potential benefits and harms of screening with their clinicians and to incorporate their values and preferences in the decision." *Id.* at 4.  Dr. Libert failed to reconcile his opinion with this overarching guidance.

Dr. Libert's opinions are additionally undermined by his admission that the *American Family Physician*, which adopted the 2018 Guidelines, was a "very good reference source." (Doc. 103 at 83).  Dr. Libert did not adequately explain why his assessment of the prevailing standard of care contradicted this publication.  Dr. Libert also did not cite any other guideline that supports his position.[15]

Dr. Libert's opinions are further undercut by Dr. Ferenchick's testimony as well.  The Court is persuaded by Dr. Ferenchick's attestations that the standard of care does not compel primary care providers to discuss PSA-based testing with men once they turn seventy, nor does it mandate that DREs be performed on men at any age since the evidence has revealed them to be ineffective.[16]  (Doc. 104 at 70–71, 79, 114).  Dr. Ferenchick buttressed his opinion with the 2018 Guidelines, as well as multiple other credible sources.  (Doc. 104 at 58–59, 71–73).  Although these medical sources

---

[15] In his post-trial submission, Dayton asserts that the 2012 Guidelines should control here because the 2018 Guidelines were not enacted until May 2018 and his last PSA-based test occurred two months earlier, in March 2018.  (Doc. 113 at 12).  Even assuming Dayton is correct, the 2012 Guidelines do not help him since they recommended against PSA-based screening irrespective of a man's age.  (Doc. 116-2).  It also bears highlighting that Dr. Libert did not rely on the 2012 Guidelines.

[16] Dr. Baker likewise testified that DREs have "fallen out of favor somewhat." (Doc. 102 at 32).

differed slightly in their recommendations, none suggested screening any men, regardless of risk factors, beyond the age of seventy-five. *Id.* at 71–73.

The Court similarly did not find Dr. Baker's testimony convincing. Akin to Dr. Libert, Dr. Baker testified that Dayton's physicians should have reviewed the pluses and minuses of prostate cancer screening with him. (Doc. 102 at 37–38). Dr. Baker opined as well that the change in Dayton's PSA velocity from September 2017 to March 2018 should have triggered a follow-up PSA test. *Id.* at 34–35.

Dr. Baker is an oncologist, however, and he acknowledged that he does not screen his patients for prostate cancer or utilize PSA velocity for that purpose. *Id.* at 62–63. Moreover, on cross-examination, Dr. Baker conceded that, without a follow-up PSA test, he could not ascertain whether the rise in Dayton's PSA from 0.5 to 0.71 over six months was a benign fluctuation or was due to cancer. *Id.* at 63. This concession is of significance here, since both Dr. Hunt and Dr. Pachynski credibly testified that the 0.21 increase in Dayton's PSA was unexceptional in light of the circumstances presented. *Id.* at 148; (Doc. 105 at 98).

Dayton also fails to establish by a preponderance of the evidence that the standard of care necessitated his physicians to discuss the risks associated with his exposure to Agent Orange. As explained above, Dr. Libert relied on two studies— *Chamie* and *Ansbaugh*—to support his opinion that Dayton's physicians should have engaged in such a conversation with him as part of the shared decision-making process. (Doc. 103 at 44–55). The *Chamie* study, however, concluded that men exposed to Agent Orange developed prostate cancer at a *younger* age. *Id.* at 73–74.

36

And the *Ansbaugh* study analyzed men subjected to Agent Orange who were undergoing prostate biopsies—not PSA-based screening—and found an increased risk of high-grade prostate cancer in that patient population. *Id.* at 47–48, 76. Neither study directly buttresses the standard of care advocated by Dr. Libert—namely, that men older than seventy who were exposed to Agent Orange should be offered prostate cancer screening on that basis. Furthermore, Dr. Libert appeared to be unaware of other literature showing that there was no association between Agent Orange and prostate cancer. *Id.* at 92.

Along with these considerations, the Court cannot ignore the fact that the evidence concerning the relationship between Agent Orange and prostate cancer is far from clear. Dr. Pachynski persuasively testified that the medical literature on this topic is conflicting and that there are reasons to question the literature which asserts Agent Orange and prostate cancer are causatively linked.[17] (Doc. 105 at 99–101). And no

---

[17] For example, Dr. Pachynski stated the following relative to the association between Agent Orange and prostate cancer:

> I think. . . there's still conflicting data[.] . . . [C]ertainly some more recent studies . . . have shown perhaps a higher correlation, and so over time, that potential association has changed. But there is still no causative link.

> So correlation does not equal causation, right? And especially when you're doing epidemiologic studies, meaning you're looking at populations and you're trying to figure things out. Oftentimes these are retrospective studies, meaning we have a database. We have medical records of things that have happened over the past [ten, fifteen] years, and we're going to go back and look and make some conclusions. Well, those don't prove causation. It's just a correlation.

> And . . . there are implicit biases when those studies are done that can affect the end result of that study and the conclusion of that study. So, for example, there's

professional organization—including the Task Force, the American Cancer Society, the American Academy of Family Physicians, the National Comprehensive Cancer Care Network, the National Cancer Institute, or the American Urological Association—recommended differential screening based on exposure to Agent Orange.  (Doc. 104 at 69–72).  Only the American Cancer Society referenced Agent Orange as a risk factor and, even then, it described it as having an unclear connection to prostate cancer, akin to diet and smoking.  *Id.* at 71–72.

Lastly, the fact that Dr. Libert and Dr. Baker predominantly relied on Dayton's former attorney to prepare their reports gives the Court pause.  At trial, Dr. Libert admitted that Dayton's previous lawyer drafted the affidavits setting forth his opinions, which he then reviewed.  (Doc. 103 at 88–89, 93).  Dr. Libert also acknowledged that

---

something called "selection bias."  So if you were to do a study of Agent Orange exposure and prostate cancer and it was a retrospective study, and you said, "I have all of these records.  I've got Agent Orange-exposed patients and non-Agent Orange-exposed patients, and I want to go back, and I'm going to look.  What's the incidence of prostate cancer?"  Well, one of the biases, one of the confounding effects is that if you have a patient who has been identified with an exposure and -- that you think might be related to prostate cancer, well, then those patients are going to get screened more aggressively and probably be followed more closely than someone who doesn't, right?  So you have to be very careful with these studies that those biases—because they can absolutely affect the conclusion, the outcome of those studies.  So these epidemiologic studies . . . can be tough[ and] can take a long time to figure it out.

And then ultimately if you really want to prove it, you know, you either have to do a prospective randomized clinical trial, really drilling down on the problem, and then also if you really want to get deep into it show it mechanistically in a pre-clinical model.  So have a mouse model prostate cancer, and say, "You know what?  I'm going to do this, and I'm going to show that this increases the prostate cancer or decreases the prostate cancer."

(Doc. 105 at 99–101).

he "adopted" the opinions prepared by Dayton's prior attorney.  *Id.* at 89–90.  And Dr. Libert testified as well that he was not aware of "a lot of" the articles included in his report before receiving them from counsel, although he did claim that he did some other research on his own.  *Id.* at 17–18, 91–92.

As for Dr. Baker's report, Dr. Baker testified that Dayton's former attorney prepared and typed up the narrative in the report, but that Dr. Baker reviewed it— spending about one minute per page.  (Doc. 102 at 52–53).  Dr. Baker also testified that the night before his deposition, he signed an amendment to his report addressing PSA velocity which was drafted by Dayton's former counsel.  *Id.* at 56–57.  Notably, Dr. Baker did not make any changes to what the attorney wrote.  *Id.*

The evidence that Dayton's former counsel initially prepared the expert reports does not automatically disqualify Dr. Libert and Dr. Baker.  *See Right Spinal*, 608 F. Supp. 3d at 1189 ("[A]n attorney may compose a first draft of an expert report, if the expert provided prior, substantial input. . . [b]ut courts will 'scrutinize the report more closely' in such situations.") (citing *Kalymon*, 541 F.3d at 638 and quoting *Cambridge Univ. Press*, 2010 WL 6067575, at *4 n.1 (N.D. Ga. Sept. 21, 2010)).  The particular circumstances in which the reports were crafted, however, leaves the Court less confident about the opinions offered by Drs. Libert and Dr. Baker.

While the Court's determination that Dayton does not satisfy the standard of care and breach components of his medical negligence claim is alone fatal to his case, the Court will nonetheless move on to the remaining element of causation out of an abundance of caution.  The Court notes at the outset that Dayton gives short shrift to

this issue in his post-trial submission, asserting in the main that the case essentially revolves around the standard of care prong. (Doc. 113 at 1). Dayton's theory— undeveloped though it is—appears to be that had the VA continued his PSA-based testing, it could have made the difference between the detection and treatment of curable localized prostate cancer as opposed to the development of incurable stage IV metastatic prostate cancer which he now has. *Id.* at 29. To support this contention, Dayton seemingly relies on the general testimony of Dr. Camuzzi and Dr. Pradhan that if Dayton's cancer had been discovered earlier, it could have at least been treated more mildly. (Doc. 103 at 116–17, 143–44).

The evidence as to what benefit, if any, additional PSA-based testing would have afforded Dayton, however, is murky. Dr. Pachynski testified, for example, that even metastatic prostate cancers can present with normal PSA values. (Doc. 105 at 107–08). Dr. Baker relatedly testified that the "period of time" for prostate cancer to become metastatic is "hard to know based on . . . the aggressiveness of the tumor. It can be variable." (Doc. 102 at 31–32).

Taking into account the entirety of the record and weighing the credibility of the witnesses, Dayton fails to establish by a preponderance of the evidence that his primary care physicians' decision not to advise him of the advantages and disadvantages of continued prostate cancer screening after March 2018 "probably would have affected the outcome." *Chiarino*, 189 F. Supp. 3d at 1384. Having reached the forgoing conclusions, the Court need not address Dayton's arguments pertaining to damages.

40

V.

In light of all the above, it is hereby ORDERED:

1.     The Clerk of Court is directed to enter judgment in favor of Defendant United States of America and against Plaintiff Joseph Richard Dayton.

2.     The Clerk of Court is also directed to terminate all pending motions and deadlines and to close this case.

ORDERED in Tampa, Florida, this 30th day of September 2024.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record

41